**STATE ex rel. MOBRAY et al. v. MASTERSON et al. (No. 652.)**

(Court of Civil Appeals of Texas. Beaumont. March 3, 1921. Rehearing Denied March 16, 1921.)

1. **Municipal corporations** ⬅23—**Town could not include any territory not intended for strictly town purposes.**

Under Rev. St. 1911, art. 1034, a town at the time of its attempted incorporation could not include within its corporate limits any "territory" that was not intended for strictly town purposes.

2. **Municipal corporations** ⬅23—**Inclusion of vacant lands does not alone invalidate incorporation.**

Inclusion within a town of several hundred acres of vacant and unoccupied lands by the incorporaters of such town would not alone render the incorporation invalid under Rev. St. 1911, art. 1034.

3. **Municipal corporations** ⬅23—**Incorporation of town held illegal on account of inclusion of oil field.**

Incorporation of a town comprising some 1,050 acres *held* illegal and an attempted fraud under Rev. St. 1911, art. 1034, on account of the inclusion of 76 acres of land comprising an oil field and used for the purpose of extracting oil from the earth by means of wells with their accompanying derricks and other machinery.

Appeal from District Court, Hardin County; D. F. Singleton, Judge.

Quo warranto by the State of Texas, on the relation of Gus Mobray and others, against E. M. Masterson and others. From judgment for defendants, relators appeal. Reversed and rendered.

Gordon, Lawhon & Pool, of Beaumont, W. O. Crain, of Houston, and B. F. Creel, and B. A. Coe, both of Kountze, for appellants.

Crook & Lord and F. J. & C. T. Duff, all of Beaumont, and O. M. Lord, of Sour Lake, for appellees.

HIGHTOWER, C. J. We find in appellant's brief in this case the following statement showing the nature and character of the action and result in the trial court, which statement is admitted by appellees to be fair and correct:

"This is a quo warranto proceeding, instituted by the state of Texas, acting through B. F. Creel, county attorney of Hardin county, Tex., upon the relation of Gus Mobray, Alex. McCullough, J. J. Ogg, A. J. Hartel, W. H. Davenport, J. A. Pelt, T. N. Miller, Peter Burch, W. H. Byrd, W. M. Flores, K. Flores, S. T. Sweet, Pres Mobray, W. A. Armstrong, F. C. Collins, the Texas Company, and the Texas Pipe Line Company, against E. M. Masterson, J. M. Mooney, J. B. Powers, W. L. Clark, J. L. Johnson, Earl Hankamer, T. A. Cromwell, John E. McEvoy, P. E. White, and A. H. Smith, G. D. Hodgson, and P. C. Hankamer. The suit was brought for the purpose of attacking the validity of the incorporation of the town of Sour Lake, Hardin county, Tex., this town having attempted to incorporate for municipal purposes under the general laws of the state. The information in the nature of quo warranto was filed on the 22d day of May, 1920, after authority had been granted by the judge of the district court of the Seventy-Fifth judicial district.

"The information filed by relators alleged that the attempted incorporation of the town of Sour Lake was illegal and void because there was included within the boundaries, considerable territory not suitable for town purposes, and not intended to be used for town purposes. It was alleged that there was included within the boundaries of the town about 75 acres of land in the oil fields, there being included the Jackson strip and the Cannon tract, these two tracts comprising a large part of the most productive portion of the Sour Lake oil field, and that on the 75 acres included in the oil field there were a large number of derricks, pumps, machinery, machine shops, pumping plants, and other paraphernalia incident to an oil field, and that practically no people resided in this section, and the only people who did reside therein did not live in the town of Sour Lake, but were separated from it by the oil fields, and that said land could not be used for town purposes and could receive no benefit from a town. It was further alleged that there was included within the boundaries of the attempted incorporation, large areas of open prairie land and considerable uninhabited and uninhabitable swamp lands; that about one-third of the area included within the boundaries of the attempted incorporation was either occupied by the oil fields or was uninhabited prairie and swamp lands, which lands were not suitable for town purposes and were not intended to be used for town purposes."

It was alleged that the individuals above-named claimed to be acting as the officers of said town of Sour Lake, and claimed that they had been duly elected or appointed to such offices of said claimed incorporation or municipality. It was prayed that the attempted or claimed incorporation be held void, and that the respondents named should be ousted from the offices they were claiming to hold.

"The relators filed their first amended original answer on July 7, 1920, which answer contained a general demurrer, general denial, plea of not guilty, and a special answer setting forth that since the filing of this suit, the city council of the city of Sour Lake had passed an ordinance eliminating certain territory within the original boundaries of the town. A copy of the ordinance was attached showing an attempt to discontinue 31.02 acres of land from the town."

Relators thereupon filed a first supplemental information, containing certain special exceptions and a further special answer.

The case proceeded to trial before the court without a jury, and resulted in a judgment by the trial court denying the attack made by relators in toto, and upholding the town of Sour Lake as having been legally incorporated and establishing the rights of the several individual respondents to the offices in the town held by them. To this judgment of the trial court, relators duly excepted, and have brought the case to this court attacking the judgment by proper assignments of error.

In view of the disposition that we have decided the record in this case compels at our hands, we find it unnecessary to pass upon the first and second assignments of error found in appellant's brief. One of these relates to the insufficiency of the answer of respondents in failing to allege specially the authority by which they claim to exercise the offices held by them in the town of Sour Lake, and the other relates to the action of the trial court in holding and ruling that the burden of proof in this case rested upon the relators.

The third and fourth assignments of error attack the finding and holding by the trial judge to the effect that the territory included and embraced within the boundaries of the incorporation of the town of Sour Lake was adapted to and suitable for town purposes, and that such territory as so embraced was intended by the incorporators or promoters, at the time of such claimed incorporation, to be used for strictly town purposes; the contention under these assignments being that the undisputed proof adduced upon the trial, in all material respects, showed, without material contradiction, that there was a large acreage or territory embraced in said attempted incorporation, which was vacant and unoccupied lands, and which was not con-

nected with the real town of Sour Lake, and which was without habitation, and much of which was swampy, low, and wet, and not suitable for town purposes, and that same was not intended to be used for town purposes at the time of such attempted incorporation. And the further contention is made that the undisputed proof in this record shows that there was embraced within the attempted incorporation at least 76 acres of land which was devoted exclusively to oil developments and operations, and which was situated in what is known as the oil fields near Sour Lake, and that said 76 acres of land, by reason of the fact that it was devoted exclusively to oil field purposes, and the surface thereof covered largely by derricks, power plants, pumping machinery, pipes, laterals, ditches, and levees, and much other paraphernalia necessary to be used in the development and operation for oil, that such land was not suitable for or adapted to town purposes, and that it was not intended by the promoters of said incorporation at the time thereof to be used for town purposes. This states, substantially, the contention of appellant on the merits of this case, and goes to the vitals of the controversy.

We shall first attempt to show what we conceive to be the law relative to these contentions of appellant, and thereafter will state the facts, substantially, upon which the trial court based the judgment in this case.

The first authority cited in appellant's brief is the case of State v. Eidson, 76 Tex. 302, 13 S. W. 263, 7 L. R. A. 733. In that case, an attempt was made to incorporate a certain district or territory, which included within its bounds the town of Hamilton; the incorporation being for school purposes only. The real town of Hamilton—that is, the "collection of inhabited houses"—extended over an area of not more than 2 square miles; the whole area, however, which was brought within the attempted incorporation, extended over 28 square miles, and included such territory as stock ranches and farms. The trial court, as against the attack made by the relators, upheld the attempted incorporation, but upon appeal the Supreme Court of this state, in an opinion by Judge Gaines, held the attempt at incorporation absolutely void, and, among other things, declared that such attempt was a fraud upon the law of this state. Among other things said by Judge Gaines in that case, in construing the statute then under consideration, was the following:

"No definition of the word 'town' is given, and it follows that we must take the word in its ordinary signification—a collection of inhabited houses. The term carries with it the idea of a considerable aggregation of people living in close proximity. A town population is distinguished from a rural population, which is understood to signify a people scattered over the country, and engaged in agricultural pursuits, or some similar avocations requiring a

228 S.W.—40

considerable area of territory for its support. A section of country so inhabited cannot be called a town, nor treated as part of a town, without doing violence to the meaning ordinarily attached to that word.

"It follows, from this, that the Legislature did not intend to confer the power of incorporating by election upon a district of country inhabited by people living in residences widely disseminated over its area. The power is conferred only upon towns and villages, and is confined to the actual residents of such localities, and does not carry with it, and confer upon a town, authority to extend the boundaries of the incorporation beyond its own actual limits. This ruling is in accordance with the policy of other statutes of a like character. A city already incorporated cannot extend its limits by any one election further than a half of a mile. * * * The object of the limitation is to prevent a city from extending its limits, so as to take in a population purely rural; and the policy of the limitation is founded upon the idea that it is unjust to subject a people to the burdens of a municipal government who share none of its benefits."

The next authority invoked by appellant is the case of Ewing v. State, 81 Tex. 172, 16 S. W. 872. In this case an attack was made by quo warranto proceedings on the city of Oak Cliff, the main ground being that the inhabitants of that town (about 2,000), which covered actually about 2 square miles, had attempted to enlarge by incorporation so as to include about 9 square miles of territory. Much of this new territory was vacant land, upon which there were some stock ranches and several farms, and, in addition, there was embraced a part of the suburban town of West Dallas. The attack was successful in the trial court, and in the Supreme Court the judgment was again upheld, in an opinion written by Judge Gaines. Judge Gaines, in delivering the opinion, among other things, stated:

"These facts in our opinion bring the case within the principles which were announced in the case of State v. Eidson, 76 Texas, 302. In that case we held that the statute which authorized towns and villages to incorporate for school purposes only did not authorize them to include within the limits of the proposed corporation adjacent territory inhabited solely by a rural population. For a stronger reason they cannot embrace territory not inhabited at all. That statute authorized towns and villages to incorporate for school purposes which were empowered to incorporate for municipal purposes under the provisions of chapter 2 of title 17 of the Revised Statutes. Sayles' Civ. Stats. art. 541a. The corporation in the present case was attempted to be created under article 340a of Sayles' Civil Statutes, which article reads as follows: 'When a city or town may contain 1,000 inhabitants or over it may incorporate as a city or town in the manner prescribed by chapter 2 of this title,' etc. It follows that the manner of incorporating towns and villages for school purposes, and for incorporating cities, towns, and villages for mu-

nicipal purposes, are precisely the same; and that if a town is not authorized to embrace within the limits of its corporation for school purposes territory beyond the limits of the actual town, a city when it seeks to create a corporation for municipal purposes must confine itself to its actual boundaries. This is the literal meaning of the statutes upon this subject. Who are empowered to create the corporations? The inhabitants of cities, towns, and villages. What are they empowered to incorporate? The cities, towns, and villages themselves, and not also such portions of the adjacent territory as their inhabitants may be pleased to embrace within the limits of the corporation.

" * * * To rebut the case made by the relators the respondents adduced testimony showing that the city of Oak Cliff had had a remarkable growth; that the increase of its population and area and of its public improvements was without a parallel in our state, and that by reason of these facts the lands embraced in the limits prescribed for the corporation were greatly enhanced in value. It was shown that the values of the real estate belonging to the relators and lying within the limits had been greatly increased, and that at the time of the trial they far exceeded the price of mere agricultural lands. If it were true that all lands lying adjacent to a city which were enhanced in value by its establishment and growth constituted a part of the city, these facts would be worthy of consideration in determining the case. But such is not the fact. A city does not extend beyond the area occupied by its houses and inhabitants. For the same reason the fact that much of the territory lying beyond the actual city has been laid off into blocks and lots as prospective additions does not aid respondents' case.

"We conclude that the court neither erred in overruling the demurrer to the information nor in giving judgment for the state upon the evidence adduced."

The case of the State v. Merchant, 38 Tex. Civ. App. 226, 85 S. W. 483, was an attack by quo warranto proceedings upon the town of Sour Lake, because of an attempted or claimed incorporation in 1904. In that case, one of the main reasons for attacking the incorporation was alleged to be that a considerable area of vacant land had been brought within the attempted boundaries of the town, which was not, in fact, a part of the town, and was uninhabited, and, in fact, much of it was not suitable for town purposes, and further that it was not intended by the promoters that such territory should be used for strictly town purposes. In the trial court the attack was unsuccessful, and the attempted incorporation upheld; but, upon appeal to the Court of Civil Appeals at Galveston, the judgment of the trial court was reversed and rendered, for the reason that it appeared to the Court of Civil Appeals, as stated by the court, that the undisputed material testimony in the case showed that there was considerable vacant territory brought into the boundaries of the attempt-

ed incorporation that was not connected with the real town of Sour Lake, as it then existed, and also because much of this territory was not suitable for town purposes, and because, upon the whole evidence, it appeared to the Court of Civil Appeals, beyond reasonable controversy, that it was not the intention of the incorporators that the territory sought to be included was to be used strictly for town purposes. The court, as will appear from the opinion, was not unmindful of the inconveniences that result to municipalities and towns when attempts on their part to incorporate shall be set aside, etc.; but, nevertheless, the court did not hesitate to discharge its full duty, as it said, to prevent the perpetration of a fraud upon the statutory law of this state. The opinion in the case was by Chief Justice Garrett, and after stating that it was shown, substantially, by the evidence, that much of the territory attempted to be incorporated was covered by swamps, jungles, and horse and cattle pens, etc., "a small part only of which was inhabited," further proceeded as follows:

"The courts will not allow such an abuse of the statute. The provision, "and including therein no territory except that which is intended to be used for strictly town purposes," was intended to embody in the statute the rule expressed in Ewing v. State, 81 Tex. 172, 16 S. W. 872, and State v. Eidson, 76 Tex. 302, 13 S. W. 263, 7 L. R. A. 733, forbidding the people of a town or village to embrace for tax purposes lands not intended to be divided into lots and occupied for town purposes.' State of Texas ex rel. Perrin v. Hoard, 94 Tex. 527, 62 S. W. 1054. The act of 1895 (Gen. Laws 1895, p. 17) limiting the amount of area that may be incorporated is restrictive of the amount, and does not authorize such incorporation when not for strictly town purposes. State v. Hoard, supra, and Judd v. State (Tex. Civ. App.) 62 S. W. 543, were decided since the passage of the act of 1895. It is a question of fact to be decided in the trial court as facts are decided in other cases; but when the uncontroverted evidence shows that the facts should not have been decided otherwise than one way, this court will not remand the cause for another trial of the facts upon a reversal of the judgment."

Both parties to this appeal cite, as sustaining their respective contentions, the case of State v. Hoard, 94 Tex. 527, 62 S. W. 1054. The attack in that case was on the town of Celeste, Hunt county, on the ground that 205 acres of land used for agricultural purposes had been illegally included in the proposed corporation, and that this was contrary to the consent and wishes of the owner of the 205 acres; and it was further specifically alleged that this 205 acres was not connected to the real town of Celeste, that is to say, that it was entirely vacant, uninhabited, and lay outside of that portion of

the town where the people lived in their residences closely connected.

The attack in the trial court in that case was unsuccessful, because the trial court found as a fact that this whole tract of 205 acres, although used as a farm up to the time of the incorporation, was well adapted and suitable for town purposes, with the exception of about 8 or 10 acres thereof, all of which was contiguous to the town proper, and further found as a fact that the incorporators or promoters of the incorporation intended, at the time of the incorporation, to use the whole of this 205 acres of land for strictly town purposes. The judgment of the trial court, denying the attack, was appealed from, and the Court of Civil Appeals, in effect, by way of certified question, asked the Supreme Court whether the facts found by the trial judge would render the incorporation valid. In answer to this certified question, Judge Brown, speaking for the Supreme Court, said, in effect, that if the facts found by the trial court existed, the incorporation was valid. In discussing article 580 of the Revised Statutes (Acts of 1895), Judge Brown further commented as follows:

"The provision, 'and including therein no territory except that which is intended to be used for strictly town purposes,' was intended to embody in the statute the rule expressed in Ewing v. State, 81 Texas, 172, and State v. Eidson, 76 Texas, 302, forbidding the people of a town or village to embrace for taxing purposes lands not intended to be divided into lots and occupied for town purposes. This court cannot say as a matter of law that the including of 205 acres of farming land of itself rendered the incorporation void. The statute makes it a question of intent which is a question of fact, and the trial court found as a fact that the land was at the time intended for town purposes, which brings it within the terms of the law."

In the Hoard Case, as will appear from the opinion of the Court of Civil Appeals, the evidence adduced upon the trial was abundantly sufficient to authorize a finding in the trial court that the 205 acres of land, although used as a farm, was intended by the promoters or incorporators to be used for strictly town purposes, and this finding upon the evidence was upheld by the Court of Civil Appeals, and, really, there can be no serious question about the sufficiency of the evidence in that case to warrant such finding, both by the trial court and by the Court of Civil Appeals, not only that this 205-acre tract of land was intended for town purposes, but that it was highly suitable for town purposes, and was contiguous to the town proper.

Appellees also cite and rely upon the case of State v. City of Polytechnic, 194 S. W. 1136. The reason for the attack in that case was based upon the fact that a tract of 65 acres of land belonging to a Mrs. Burchill had been brought within the limits of the town by the promoters of the incorporation against the owner's consent, and specific grounds of attack were that the land was wholly vacant and unoccupied, and was not suitable for town purposes, and was not intended to be used for such purposes. The case was tried with a jury, and it was found by the jury, as a fact, that the entire tract of 65 acres was suitable for town purposes, and that, although not actually occupied by residents at the time of the incorporation, it was intended by the incorporators to be used for strictly town purposes. Upon the verdict establishing these facts, the trial court rendered judgment denying the attack, and upheld the incorporation. On appeal to the Amarillo Court of Civil Appeals, the judgment of the trial court was affirmed. It is clear from the evidence in that case, as recited in the appellate court's opinion, that this 65-acre tract of land was clearly adapted to and suitable for town purposes, and the evidence clearly justified the finding by the jury that it was intended by the promoters and incorporators that this tract of land would be used for town purposes, in keeping with the very letter of article 580 of the Revised Statutes. The Court of Civil Appeals, in disposing of the appeal in that case, among other things, said:

"Taking the two articles, 777 and 1034, together, they authorize a town of over 2,000 and less than 5,000 inhabitants to incorporate 4 square miles of territory including territory intended to be used for strictly town purposes. The Legislature granted that power to the promoters, and to that extent the ordinary understanding of or definition of a town is qualified. These articles were enacted subsequent to the two first cases cited from the Supreme Court [State v. Eidson and Ewing v. State, supra], and, to Judge Gaines' suggestion that there was no definition of a town by the statute, the Legislature responded by an act to define the territory, and further modifying the rule that such territory could include land where it was intended to be used for town purposes. This certainly modified the rule that the incorporation should be marked by an area of the aggregation of residences and of appurtenant structures. The inclusion of farm land, Judge Brown said, in the Hoard Case, would not invalidate the incorporation as a matter of law; but 'the statute makes it a question of intention, which is a question of fact.' To have instructed the jury, with reference to the power to incorporate a town, that only such as was marked by the area of aggregated residences and appurtenant structures could be incorporated, would be error. Under the statutes, a town of over 2,000 and less than 5,000 could incorporate an area of 4 square miles if it was intended the territory included should be used strictly for town purposes. As suggested by Judge Gaines in the Ewing Case:

"'In the absence of abuse of power, it would be the duty of the court to respect the legislative will, and to hold the incorporation of

such additional territory valid'—the very thing which Judge Brown subsequently did in the Hoard Case."

[1] It is clear from article 580 of the Revised Statutes of 1895, now article 1034, that the town of Sour Lake, at the time of the attempted incorporation, could not include within the corporate limits any "territory" that was not intended for strictly town purposes, because that article expressly says:

"And including therein no territory except that which is intended to be used for strictly town purposes."

Now, in this case, it is the contention of appellant here that the judgment of the trial court must be reversed for two reasons, first, because a considerable part of the territory that was brought within the boundaries of the attempted incorporation was wholly vacant and unoccupied, and formed no part of the real, actual town of Sour Lake, that is to say, formed no part of the territory which was actually occupied by residences closely contiguous to each other, and also because much of this vacant and unoccupied territory was, by reason of its being low and wet and swampy, not suitable for town purposes, and that this, alone, would be sufficient to invalidate the attempted incorporation; but, if mistaken in this contention, as a second reason, as we understand appellant's contention, it asserts that the inclusion of the 76 acres of land, as hereinabove mentioned, which was devoted exclusively to the development of oil, and was an established and proven oil bearing territory, the same was not adapted to nor suitable for town purposes, and that the practically undisputed material evidence in this case showed that it was not the intention of the incorporators or promoters of the town to use this oil field for strictly town purposes.

[2] We shall not further discuss the authorities which we have mentioned above, and from some of which we have quoted; but as we construe the holding by Judge Brown on the certified question in the Hoard Case, we would not be warranted in holding as a matter of law that the inclusion of the vacant and unoccupied lands by the incorporators of the town of Sour Lake would, alone, render the incorporation invalid. It would be otherwise, in our opinion, if we should apply the rule announced in the Eidson and Ewing Cases, supra; that is, if we should hold as there held, that the incorporators could not bring in territory which was vacant and unoccupied and in no manner used for town purposes at the time of the attempted incorporation. But, as we have stated above, the rule seems to have been changed on this point by the holding in the Hoard Case, supra, for the 205 acres, consisting of a farm and in no manner used for town purposes, was brought into the boundaries of the incorporation; but on the finding by the trial court that this contiguous farm was suitable for and adapted to town purposes, and that it was intended by the incorporators to use it for town purposes, Judge Brown said that it was properly brought within the boundaries of the incorporation. This holding was, undoubtedly, because of the Act of 1895 (article 580), which Judge Brown construed as empowering the incorporators to do what they did in that case, provided it was intended by them that this vacant and suitable territory was to be used for town purposes. Now in this case, while there are strong reasons for the contention of appellant that much of the vacant and unoccupied territory that was brought into this incorporation, there being several hundred acres of it, lying mostly in the southeast and northeast corners of the boundaries, was hardly suitable for town purposes, that is, adapted to such use, still we do not feel authorized to say, as against the holding of the trial judge on that point, that it is clear that such vacant and unoccupied territory was not and could not be rendered reasonably adapted to or suitable for town purposes, and that the quantity of such territory is so great as to authorize us to hold, in the face of the trial court's conclusion, that it could not have been reasonably the intention of the incorporators that this territory would be used for town purposes. It cannot be denied that much of it, because of being so low and swampy, would seem very unsuitable and unadapted to town purposes; but we will not make such holding as a matter of law.

[3] Coming, however, to what we consider the vital and insurmountable obstacle in this case for the appellees, that is, as to whether the 76 acres of land comprising what is known as and called the oil field lying north and west of the real town of Sour Lake, had the effect to render this incorporation invalid. We have read very carefully all the evidence, in detail, having reference to this point, and have examined the several photographs sent up with the record for the inspection of this court, as portraying the surface situations, etc., as nearly as could be had of this 76 acres of land. It would be impracticable and next to impossible to let this opinion show the situation as revealed by these photographs; otherwise, we would be glad to do so. Nor would any useful purpose be subserved by attempting to state in detail the testimony of the witnesses with reference to the suitableness of this oil field for town purposes, and we will not attempt to do so, but will only state the substance of the material facts as they appear from the undisputed material evidence in this case. The following are the undisputed facts as we glean them from the record:

This 76 acres of land, practically as a whole, has been a proven oil field and has been continuously developed and operated

for the production of crude oil since 1903. Since that time the record in this case shows many wells have been put down in this territory, and the discovery of this oil field and its successful operation caused the little village of Sour Lake to grow from perhaps something like two or three hundred population to as large a population, perhaps, as 5,000. At the time the incorporation here attacked was attempted, the undisputed proof shows there were something like 93 standing derricks in this oil field on this 76 acres of land, not placed upon the surface in any regular order, according to any particular method or system, but wherever it might be deemed an oil well could probably be brought in. All the wells, however, over which these 93 derricks stood at the time of the attempt to incorporate, were not producing, but some of them had been abandoned, at least temporarily, but many of them were still producing oil, and many of these derricks were new ones, and many of the wells new wells, or comparatively so. It was shown, by the undisputed proof, that because a well would be abandoned did not indicate that it was permanently abandoned, but that frequently it was the custom in the oil field to go back to an abandoned well and by proper efforts many of them are made to again produce. It was further shown, by the undisputed evidence, that in the operation of this oil field, pump stations, power plants, underground tanks, slush pits, salt water drains and ditches, as well as much other paraphernalia used in oil development, were employed and in use upon this oil field, and that really, such machinery and other paraphernalia were indispensable in the successful operation of this field for oil. It was further shown, by the undisputed testimony, that practically no one lived upon this oil field, with the exception of Texas Company employés, who will be referred to later. It was shown, without dispute, that at the time of the attempted incorporation, the population of the town of Sour Lake was on the decrease, and that up to the time of the trial in this case, there had been no attempt on the part of any persons to use this oil field for town purposes, or that there was any expectation that it would be so used, or that the officers of the claimed town had any intention of doing anything in this oil field or concerning it that would render it habitable and suitable for town purposes.

It was shown, however, that the Texas Company, one of the relators in this case, and which concern, the proof shows, owned about 38 acres of this 76-acre oil field, commencing several years ago, built some houses for certain of its employés on what is known as the Wilde or Cannon tract, lying northwest of the town proper of Sour Lake; the first of these houses, if we mistake not, having been built some seven or eight years ago, and others as late as 1917 or perhaps 1918. It was shown, without dispute, that these houses were built upon property owned in fee simple by the Texas Company, and that they were built exclusively for the use of its employés, so as to have them convenient to their oil field work, and that no persons other than its employés were ever permitted to enter one of these houses, and further, in this connection, it was shown, without dispute, that another controlling reason for building these houses for its employés was their protection against strikers in the oil field, and the purpose was to have these employés where they might be protected upon the company's own property from violence offered by these strikers. In all, the evidence shows there were 22 of these houses, and the undisputed proof is that in constructing them care was taken to so place them on the surface that they would interfere as little as possible with the development of the land for oil; that they were made as convenient for the employés as was reasonably possible, but all these conveniences were furnished by the Texas Company at a very small profit, if any, in the way of rent. The proof shows further that there was one other house, that of a Mr. McCullough in the extreme northwest corner of the Wilde or Cannon tract, and in close proximity to these Texas Company houses, in which Mr. McCullough lived, and he owned his place there. Outside of this man McCullough, it might be stated that this entire 76 acres of land, comprising the oil field, was without habitation in the way of residences other than these Texas Company employés and two or three others, perhaps, alluded to as squatters on the property of others, and who were there merely at the will and sufferance of the owners. It was further shown, without dispute, that right around these 22 Texas Company tenant houses, there were 12 or 13 producing oil wells at the time this incorporation was proposed, and further that at times the offensive odors, etc., arising from the operation of these wells was quite annoying, and further that the danger of fire, by reason of escaping gas, etc., on the oil field, was very great, and that for residence purposes the oil field proper was rendered very undesirable on account of these things.

McCullough's house above mentioned is in such close proximity to four of the oil derricks over producing wells that his house would be in danger of being struck if one of them should fall in his direction. The undisputed evidence is that the height of these derricks over the entire field of 76 acres ranges from 84 to 112 feet, and in some places on the field the photographs in the record show a perfect network of these derricks. The operated wells are connected by rods and other means to the pumping plants, and these rods and other means of operation are laid along and upon the surface of the lands

in the oil field. It was further shown, without dispute, that the 22 houses of the Texas Company, above mentioned, were practically all that could be put on its property, without interfering with its operation for oil, and that the company did not intend to build other houses, or to permit their being built because there would not be room for the operation of the territory for oil. There was not a word in the evidence, as we read it, to indicate that the incorporators intended, within the reasonably near future, to make any change or attempt to make any change whatever in this 76 acres of land, comprising this oil field, or that it was intended by them that the municipality, when established, should in any manner take charge of or assert its authority in that field. Nothing was said about any intention to lay out or improve any streets or construct or build any sidewalks, or to attempt to lay out this property in blocks and lots, either with or without the consent of the owners; nor, indeed, was it stated by any witness that there was any necessity for any such undertaking or attempt on the part of the municipality. This oil field, which is owned by several different companies and individuals, has undoubtedly furnished, in a large measure, the means of support and growth of the town of Sour Lake, and it is clear, beyond dispute, that this oil territory is of great value, and that costly and valuable machinery is placed practically all over it for the operation of the field for oil.

Upon such facts as these, and we have not mentioned them all, could it be said, in reason that the promoters of this town intended, at the time of the attempted incorporation, that this oil bearing territory should be devoted to or would be used for strictly town purposes, as the expression "town purposes" is defined in several of the authorities above mentioned? Could it be said, in reason, that the municipality intended to enter upon this oil field and cut it up into blocks and lots and lay out streets and sidewalks, etc., such as a town or municipality would be expected to do on land suitable for such purposes? If so, what did they intend to do with the valuable holdings of the owners of this property? What did they intend to do with the entire equipment, machinery, and paraphernalia necessary to the operation of the oil wells? Where did they intend to put or what did they intend to do with these numerous derricks situated without regularity throughout most of the entire field? And where, in view of the undisputed evidence with reference to other vacant territory, and far less valuable, such as prairie lands that they did bring into the incorporation, was the necessity for the municipality, when created, to enter upon this valuable oil field and practically destroy it for oil development purposes? Yet the mayor, who was the only material witness, as we see it, for the respondents in this case, said as a witness on the stand that with the exception of about 31 acres of that field, he considered the remainder of it suitable for town purposes, but he did not say, as we see the record, anywhere that it was intended that this field would be used for town purposes. But if he had said so, his statement would be calculate to stagger the credulity of any reasonable mind.

One day before the trial of this case in the trial court, the city council of the claimed city of Sour Lake passed an ordinance, by the terms of which it was attempted to eliminate 31.02 acres of land from the incorporation, and as its reason for such attempt, the council, in the ordinance, stated the following:

"Sec. 3. That whereas there is a suit pending against the officers of the city of Sour Lake in the nature of a quo warranto, and the corporate existence of the city of Sour Lake is threatened and unless the territory herein described is discontinued and eliminated, the same being unfit for town purposes, the city of Sour Lake is in great danger of losing said suit, and a public emergency is thereby created, and the mayor of said city has requested that this ordinance be passed at this meeting of the city council, it is therefore, ordered that the rules be suspended and that this ordinance be put upon its last reading and final passage and be in force from and after this date, and it is so ordered."

The field notes of the 31 acres of oil territory attempted to be eliminated by this ordinance were given in the ordinance. It is to be seen at a glance that the council itself stated expressly in this ordinance that at least this 31.02 acres was unfitted for town purposes, and while they did not say that this was not known by the would-be incorporators, the whole evidence shows there had been no material change favorable to the city's contention, and that the only reasonable conclusion must be that this 31.02 acres was just as unsuitable and as unfit for town purposes at the time of the attempted incorporation, as it was at the time this ordinance was passed. One of the members of this court is of the opinion that this admission, of itself, would be sufficient to invalidate the claimed incorporation; but it is unnecessary that our disposition should be based upon that admission.

Now the learned trial judge in this case, notwithstanding the undisputed facts as we have detailed them faithfully, found that all the land originally embraced in this attempted incorporation, with the exception of possibly 11 acres, was suitable for town purposes, and that all of the land as originally embraced was intended to be used for strictly town purposes, and the trial court made such finding in the face of the admission which was attached to the answer of respondents, to which we have just called attention. The proof is that there is approximately 1,050

acres embraced within the attempted boundaries. How the trial judge could have reached these conclusions, we are wholly unable to understand from the record, and cannot escape the conviction that he was clearly wrong. It is true, as contended by the appellees, that the little city or town of Sour Lake was shown to be quite a prosperous and thriving little city, and that there are a number of substantial business buildings located in the town proper; that there are church buildings, school buildings, and a number of desirable and perhaps several elegant private residences in the town proper, and that there are two railroads in the town; and, further, that there were at the time of the trial several buildings under construction in the town, but, in our opinion, these admitted facts cannot be permitted to control the disposition of this case, and upon the whole case we are utterly unable to escape the conclusion that to permit the incorporation in this case to stand, as was attempted, would be for us to sanction that which is clearly a legal fraud, as said in some of the cases referred to. It is true the trial judge found that there was no bad faith on the part of the incorporators, and that there was no actual fraud perpetrated or intended to be perpetrated by them, but that there was a legal fraud is so clear to us, when the evidence is all considered, we have no doubt. We must hold, in the discharge of the duties resting upon us, that the attempted incorporation in this case was invalid, and cannot stand, and that the individual respondents were never legal officers, as claimed by them. All of this we do reluctantly, of course, because we are not unmindful of the inconvenience and perhaps complications of a business nature that may result from disturbing this attempted incorporation, but it is our duty to so hold, regardless of such consequence.

The judgment of the trial court will be reversed and here rendered in accordance with the views above expressed.

---

⬡➾For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes